ELIZABETH BABB AND OTHERS V. GEO. CARROLL AND OTHERS.

Where a man and woman emigrated to Texas in 1835, and from that time to
the death of the man, in 1837, lived and cohabited together and passed them-
selves and were reputed as husband and wife, lands acquired by the husband
as a colonist are community property between them to the exclusion of a
wife elsewhere.

A certificate issued to a man as the head of a family, enures so far as commu-
nity rights are concerned, to the family recognized and admitted as such,
and for whose benefit it was intended ; and our Courts have not, years after-
wards, authority to look to foreign countries to ascertain whether the husband
may not have left a family elsewhere.

In granting a certificate it was the duty of the Commissioners to inquire
whether the party applying had a family in Texas, and having determined
the fact it is not open to subsequent investigation after the issue of patent
or even before.

The fact that the certificate was issued to the heirs of the husband is of no
consequence.   The right to the land accrued upon emigration.

Under the practice of the Board of Land Commissioners and the District
Courts the date of the purchase of a claim to a headright did not affect its
validity.

Under the law in force in Texas in 1837, the surviving husband or wife were
under no circumstances heirs of the deceased, except in cases where the sur-
vivor was poor and the deceased was rich.

Error from Collin.   Tried below before Hon. N. M. Bur-
ford.

Trespass to try title.

David E. W. Babb, by virtue of whose emigration a certi-
ficate for a league and labor of land was issued to his heirs,
was married to Elizabeth Babb, one of the plaintiffs, in 1807,
in the State of Tennessee ; the other plaintiffs are the legiti-
mate children of said David and Elizabeth.   In 1829 David
Babb abandoned his wife Elizabeth, and after living adulte-
rously for several years with one Eda Collier, alias Hardy, in

1835 he came with her to Texas bringing also her son by a
former adulterous connexion, a youth about fourteen years old,
and settled in the present limits of Red River county.  Said
David Babb and Eda lived together as man and wife until the
death of the former, which occurred in 1837.   It appeared in
evidence that Eda well knew that Babb had a wife and family
at the time she lived with him, both before and after coming
to Texas, and that she was never married to him.   The certi-
ficate was issued in 1838 to the heirs of Babb and recom-
mended subsequently as genuine, by virtue of which the land
in controversy was patented in 1845.

The defendants claimed one-half of the land through R. M.
Hopkins, for which Babb in his life-time had executed to said
Hopkins a bond for title, and the other half by purchase from
the said Eda Babb, or Collier, and her son.

There was a verdict and judgment for defendants.


*S. H. Morgan*, for plaintiffs in error.

*J. T. Mills*, for defendant in error.


HEMPHILL, CH. J.   The first question is, was Mrs. Eda
Babb, or Eda Collier, entitled to the half of the land in con-
troversy?   This must be answered in the affirmative.   At the
time of the emigration of David and Eda Babb to Texas, in
1835, and at the Declaration of Independence in March, 1836,
and to the death of David Babb in 1837, they lived and
cohabited together and passed themselves and were reputed
by their neighbors as man and wife.   There is no proposition
more clear or indisputable than that grants of lands to heads
of families were made on the supposition that the family was
a Texas and not a foreign family ; that the family was in fact
in Texas, and as such was the meritorious consideration of the
grant.   And although, by construction, the rigor of this pro-

vision has been relaxed to the extent that where an applicant has a fixed domicil in Texas, having broken up his domicil elsewhere, he shall not lose his right to a certificate, or grant, from the mere isolated fact that the family was not here at the accrual of the right, or at the time of the application for the grant. (See Young's case in Dallam and the Skidmore cases in the Texas Reports.) Yet it has never been imagined that when there was a family in Texas recognized and admitted as such, and being the very objects that were the consideration of the grant and for whose benefit it was intended, the Courts had authority, years afterwards, to look to foreign countries to ascertain whether the husband, &c., may not have left a family elsewhere. The family ought to have been here in fact, and in contemplation of law was here to authorize the grant, and if there were a family here at the accrual of the right to the grant, the members of that family, to the extent of the community right of the wife, or reputed wife, must take to the exclusion of claimants elsewhere, who, in fact, formed no part of the family contemplated by the law as the proper recipients of the bounty of the Government.

The evidence is very conclusive that David and Eda Babb were reputed and treated in their social relations as man and wife. There cannot be a shadow of doubt that, as the head of the family thus organized, David was regarded as entitled, and his heirs through him as entitled, to the grant, and on his merits and rights as the head of this family the grant did issue. If David was entitled to a grant at all, it was as the head of this family, and not because he had a family in Tennessee with which, in fact, this Government had no concern, and as the family here was the moving consideration of the grant, the wife was entitled on general rules and on the principles of our previous decisions to a community interest in the land.

It was for the Commissioners to inquire whether David and Eda constituted a family in Texas at the declaration of Inde-

pendence, and the fact having been determined is not open to subsequent investigation after the issue of the patent, or even before, and especially as the certificate has passed the ordeal of the investigating Board of Commissioners and been recommended as a genuine claim.

The fact that the certificate was issued to the heirs of David Babb is of no consequence.   The right to the land accrued upon emigration and was fixed by the Constitution, and whether the certificate issued to the widow, to the administrator, or to the heirs of David Babb, has not the slightest effect upon the rights of those entitled to a share of the land. The right of claimants depends on the law, and not upon the fact of the certificate being issued to one party or another. If issued to the widow, one-half is for the benefit of the heirs ; if to the administrator or heirs, one-half goes to the widow by virtue of her community right.

We are of opinion that Eda Babb was entitled to one-half of the lands claimed under the certificate and patent, provided David Babb did not transfer the right to some portion of the lands during his life, and, if so, she was entitled to but one-half of the remainder.

The defendants claim one-half of the lands by virtue of a sale from R. M. Hopkins, who claims under bond for title from David Babb, dated 29th November, 1835.

Was this bond valid ?   The bond was in fact an agreement to clear out the headright of Babb for the one-half of the land.   Had this bond been given before the close of the Land Offices, and had Hopkins procured titles to issue from the officers of the former Government, the agreement regarded as a sale in substance of the one-half of the lands would have been invalid by reason of the inhibition against the sale, by colonists, of their lands for six years, modified by the last Section of the Decree of 26th March, 1834, authorizing sale, but not until after the issue of title.   But the Act was after the closing of the Land Offices, and the question of validity

does not depend so much upon the terms of the law at its date, or whether the prohibition against sale might not, at that time, be regarded as inoperative and contrary to the policy of the new Government in the course of erection upon the ruins of the old, but whether the validity of all such partial or full assignments of headrights was not recognized by the provi- sions of the Land Law of December 14, 1837, which authorized the assignees of headrights to appear before the Boards of Land Commissioners and prove, for their own benefit, the rights of their assignors to a grant.    (Art. 1849.)    It is be- lieved to have been the practice of Boards of Land Commis- sioners, and of District Courts, on claims through assignees, not to regard the date of assignment as material.    That the date of the purchase of a claim to a headright did not affect its validity, the only questions being as to the fact of the pur- chase and the merits of the assignor ; and on proof of these the certificate issued.    There is no difference in principle be- tween the purchase of the entire claim and of the one half for clearing out the other.

The bond, on proof that Hopkins discharged his obligations, was valid, and the purchasers under him will be protected.

The fact that Hopkins was one of the Board of Land Com- missioners who recommended the certificate for patent cannot affect the rights of those who purchased from him especially, without notice.    His bond had been on record for years.    His claim was known.    But would any one imagine that it was the duty of a purchaser from him to inquire into the fact of, whether he had held perchance a public office, and performed some act in that office repugnant, by implication to his rights under the bond.    As Commissioner, he took an oath that he would not recommend to the Commissioner of the General Land Office any certificate for land in which he was interested. He signed the report with the other Commissioners recom- mending claims, among which the Babb claim was one.

The act does not affect the validity of the certificate, and

though the implication may be so strong as possibly to estop Hopkins from setting up a claim against the heirs of Babb, it could not affect innocent purchasers from him without notice of an act into which they were not bound by law to make an inquiry. If he had made a voluntary transfer of his right to the heirs of Babb under the bond, the heirs could not without notice actual or constructive have set up the transfer to defeat a subsequent purchaser from Hopkins for valuable considera- tion, and they cannot impute more efficacy to his act of estop- pel, by implication, than they can to an express assignment. It is not intended to intimate that Hopkins would be estopped as against the heirs. They did not act on this implied renun- ciation of claim. They did not bring suit until thirteen years afterwards, nor until five years after he had sold to others. In no sense can his act, recommending the certificate, operate to the prejudice of defendants. If David Babb had sold again after the Declaration of Independence, a question of impor- tance between the two purchasers from Babb ; but there is no evidence that Hopkins' right was ever disputed by Babb or Mrs. Eda Babb after the death of her reputed husband.

It appearing that the sale by Babb in his life time to Hop- kins is valid, Mrs. Eda Babb, instead of being entitled to the one half of the whole, can claim but the one half of that re- maining unsold. Her right is thus diminished to the one fourth of the league in controversy, and to this extent her conveyance will protect the purchasers. The remaining fourth falls to the children of David Babb, who, though residing in a foreign country at the time of his death were his heirs, having a reasonable time to assert their rights, which not expiring be- fore annexation, they were placed on the same footing with heirs residing in Texas ; and as there was no proof that they were barred by limitations, they must recover the undivided fourth of the league.

The plaintiff Elizabeth has no community right in this land, and cannot claim as an heir of the deceased ; and as there

Babb v. Carroll.

seems some misapprehension below as to the right of a wife to inherit from a husband who died childless, it may be remarked that at the death of David the laws of Spain, as they existed before the separation of Mexico from that country, were in force in Texas; and by these laws the surviving husband or wife were, under no circumstances, the heirs of the deceased, except in cases where the survivor was poor and the deceased rich—the former had a right to one-fourth of the estate of the deceased, limiting this fourth to a specific account.

L. X. The Law, (1 Tit. 22, Lib. 10, Nov. Recop.,) declared that where there were no heirs, ascendants, or descendants, the property of the deceased should go to the Treasury. There were previous laws which secured the surviving husband or wife in the succession of the deceased under certain contingencies.

The Law, (11, Tit. 2, Lib. 4,) of the Fuero Jurgo, which gave the inheritance to the surviving husband or wife, when there were no other relations of the deceased to the seventh degree: and the Law, (6, Tit. 13, Part 6,) by which the surviving husband or wife succeeded to the estate, when there were no relations within the tenth degree. But these laws were, by commentators generally, supposed to be impliedly repealed by the law above cited from the Recopilacion, although some were of a different opinion on the ground that the terms of the law in the Recopilacion were general, and did not refer specifically to the former laws on the rights of surviving husband or wife under those laws.

The received opinion of commentators has been held as the rule in Texas, namely: that under the Spanish Law the surviving husband or wife, under no circumstances, succeeded to the whole estate of deceased, as his heir; and only to the marital fourth when necessary as a relief against poverty.

The defendants are entitled to judgment against the plaintiff Elizabeth, and that she recover nothing. They are also entitled to judgment for three-fourths of the land as against

the other plaintiffs; and the plaintiffs (Elizabeth, the mother, excepted) must recover judgment for the undivided fourth of the league in controversy. And it is ordered that the judgment be reversed, and that the cause be remanded and judgment entered below in conformity with the directions in this Opinion; that the parties be at liberty to amend their pleadings, if so advised; and that the Court proceed to issue writ of partition, and have the land divided in conformity with law and the equitable rights of the parties.

Reversed and remanded.